# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| NVR, INC., | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 2024-1051-DG |
| CARTER FARM, LLC and CHOPTANK ROAD, LLC, | ) ) ) | |
| Defendants. | ) ) ) | |

## REPORT GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Date Submitted: October 22, 2025
Date Decided: February 4, 2026

Scott G. Wilcox of GIORDANO, DELCOLLO, WERB & GAGENE, LLC, Wilmington, Delaware, *Counsel for Plaintiff NVR, Inc*.

Blake Rohrbacher, Katherine L. Mowery of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, *Attorneys for Defendants Carter Farm, LLC and Choptank Road, LLC*.

**GIBBS, M.**

The plaintiff in this action seeks to enforce contracts to build a residential housing development on 415 acres of real property in New Castle County. The parties executed the contracts in 2009. They encountered numerous obstacles, and the contemplated development never materialized. In 2024, the plaintiff asked this Court to enforce the contracts.

In this report, I conclude that the plaintiff's complaint must be dismissed because its claims are time-barred under either the statute of limitations or the doctrine of laches. The plaintiff has, at times, pleaded facts that are conclusory and inconsistent with public facts of which I have taken judicial notice. The plaintiff's theory would require me to draw inferences from the pleaded facts that are unreasonable. The suggestion that the plaintiff was unaware of its claims, or at least of facts that would lead a reasonably prudent person to investigate, until after March 4, 2022, is not credible. I recommend that the Court dismiss the plaintiff's complaint in its entirety.

# BACKGROUND[1]

The following facts are drawn from Plaintiff's Verified Complaint ("Complaint"), the attached exhibits, the documents incorporated by reference therein, and facts of which I have taken judicial notice.[2]

## I. The Parties

Plaintiff NVR, Inc. is a Virginia corporation in the business of building homes and mortgage banking.[3] NVR sells and constructs homes under the Ryan Homes, NVHomes and Heartland Homes brands.[4]

Defendant Carter Farm, LLC, is a real estate development company with its principal place of business in Wilmington, Delaware.[5] Carter Farm was formed for the sole purpose of building a single-family residential

---

[1] In this report, I cite to Pl.'s Verified Compl., Dkt. 1, as "Compl.," Defs.' Opening Brief, Dkt. 8, as "OB," Pl.'s Answering Brief, Dkt. 30, as "AB," Defs.' Reply Brief, Dkt. 32, as "RB," and the Tr. of Oral Argument on Defendants' Motion to Dismiss and Cancel Lis Pendens, Dkt. 35, as "Tr."

[2] *See* D.R.E. 201–02; *Windsor I, LLC v. CWCaptial Asset Mgmt. LLC*, 238 A.3d 863, 874 (Del. 2020) (quoting *In re General Motors*, 897 A.2d 162, 169 (Del. 2006)).

[3] NVR Inc., https://www.nvrinc.com/ (last visited Jan. 10, 2026). NVR is licensed to conduct business in Delaware and has an office in Bear. Compl. ¶ 2.

[4] NVR Inc., *Corporate Profile*, https://nvri.gcs-web.com/corporate-profile (last visited Jan. 10, 2026).

[5] Compl. ¶ 3; *see Carter Farm, LLC v. New Castle Cty.*, 2014 WL 3555958, at *1 (Del. Ch. July 17, 2014) ("*Carter Farm I*").

development on the real property at issue in this litigation.[6] Louis Capano, III, is a member and the primary manager of Carter Farm.[7] Defendant Choptank Road, LLC is a Delaware limited liability company with its principal place of business in Wilmington, Delaware.[8] Capano is also a member and the manager of Choptank Road.[9]

## II. The Property

This litigation concerns approximately 415 acres of land located at 1240 Bethel Church Road in Middletown, Delaware ("Property").[10] The Property was originally comprised of seven parcels, bearing Tax Parcel numbers 11-57.00-010, 11-57.00-012, 11-061.00-001, 11-061.00-005, 11-061.00-006, 11-061.00-007, 11-61.00-008 ("Original Parcels").[11]

---

[6] *See* Compl. ¶ 3, *Carter Farm, LLC v. New Castle Cty.*, C.A. No. 1641-VCG (Del. Ch.), Dkt. 1 (Sep. 19, 2005).

[7] Compl. ¶ 3.

[8] *Id.* ¶ 4.

[9] *Id.* ¶ 4.

[10] *Id.* ¶ 7; New Castle Cty., Parcel # 1106100001, PARCEL DETAILS, Deed History https://www3.newcastlede.gov/parcel/Details/Default.aspx?ParcelKey=12 5311 (last visited Dec. 3, 2025), *hereinafter* Parcel Records. The Court may take judicial notice of parcel records. *See* D.R.E 201(b)(2).

[11] OB Ex. A at Representations ¶ 1; OB Ex. B at Representations ¶ 1.

## III. Activity predating Defendants' contracts with NVR

The Property was deeded to the Carter family in or before 1979.[12] Early plans to develop the Property did not bear fruit.[13]

On September 19, 2001, the Carter family submitted plans to develop residential lots on the Property ("2001 Plan") to New Castle County ("County").[14] The Carter family worked in conjunction with Carter Farm to seek approval for the subdivision.[15]

On April 6, 2004, the Carter family conveyed the Property by deed to Carter Farm.[16] Carter Farm presented a revised 2001 Plan to the County for

---

[12] *See* Parcel Records, *Deed History* at WR071887 (last visited Jan. 13, 2026).

[13] *See* New Castle Cty., *Project # 19970620*, https://www3.newcastlede.gov/Project/Details/Default.aspx?ProjectKey=540393 (last visited Jan. 13, 2026). *Contra Carter Farm I*, at *1 ("On September 10, 2001, the Plaintiff submitted a plan to New Castle County for a residential development . . . ."). *See also* Parcel Records (indicating that Project 19970620 is "Inactive").

[14] *Carter Farm I*, at *1; New Castle Cty., *Project # 20011068*, https://www3.newcastlede.gov/Project/Details/Default.aspx?ProjectKey=89787 (last visited Jan. 13, 2025); OB at 3; *see also* OB Ex. B 9(l) ("[A]ll of the Lots . . . are in compliance with . . . subdivision requirements[.]"). The Court's Opinion in *Carter Farm I* states that Carter Farm submitted this plan, but the Carter family appears to have owned the Original Parcels at this time. *Contrast* Parcel Records, *Project Filings with Carter Farm I* at *1.

[15] *Id.* at *Records Relating to Proceedings*, https://tinyurl.com/y8hy44f7 (last visited Jan. 13, 2026).

[16] Compl. ¶ 8; New Castle Cty. Recorder of Deeds, *Public Access, Search, Carter, Charles M.* https://newcastle.dts-de.com/PaxWorld/views/search# (last visited Jan. 13, 2026).

review at some point before June 21.[17]  Around the same time, however, the County opted to scale back its plans for a sewer system, which rendered the 2001 Plan untenable.[18]

On September 9, 2005, Carter Farm sued the County in this Court to enjoin it from declaring that the 2001 Plan had "expired."[19]  On May 31, 2007, the Court entered a status quo order to that effect.[20]  In November 2007, Carter Farm and the County reached a settlement, which provided that the County would approve the construction of a sewer system on the Property and Carter Farm would pay the County $24 million.[21]  Neither side executed the settlement documents and Carter Farm did not dismiss the lawsuit.[22] Nevertheless, Carter Farm and the County worked to implement the

---

[17] New Castle Cty., *Project # 20011068, Planning Review Reports*, https://tinyurl.com/5baba882 (last visited Jan. 13, 2026).

[18] *Carter Farm I*, at *1.

[19] *Carter Farm I*, at * 1 (citing Verified Compl., *Carter Farm LLC v. New Castle County*, C.A. No. 1641-VCG (Del. Ch.), Dkt. 1 (Sep. 9, 2005)).  The Court may take judicial notice of "the records of the court in which the action is pending and of any other court of" Delaware.  D.R.E. 202(d)(1)(C).

[20] OB at 4;  Stipulated Status Quo Order, *Carter Farm LLC v. New Castle County*, C.A. No. 1641-VCG (Del. Ch.), Dkt. 11 (May 31, 2007).

[21] *Carter Farm I*, at *1–2.

[22] *Carter Farm I*, at *2.

settlement's terms.[23]  On February 20, 2008, Carter Farm submitted a second revised plan to the County ("Preliminary Plan") for consideration.[24]

## IV.  Carter Farm agrees to sell the Property to NVR but runs into roadblocks with the County.

On May 8, 2009, Carter Farm and NVR entered into two lot purchase agreements ("LPAs") to sell the lots being developed on the Property.[25]  The LPAs defined the lots as 214 "single family detached residential dwellings all as authorized by the Record Plan" and 360 "single family residential dwellings . . . all as authorized by the Record Plan."[26]  At the time the LPAs were executed, the "Record Plan" was defined as the Preliminary Plan, which had been submitted in February 2008 and was then undergoing County review.[27]  The Preliminary Plan listed the Original Parcels and the recorded 2004 conveyance from the Carter family to Carter Farm in the land description.[28]

---

[23] *Carter Farm I*, at *2.

[24] *See* Appendix Tabs 5-10, Ex. 9, *Carter Farm LLC v. New Castle County*, C.A. No. 1641-VCG (Del. Ch.), Dkt. 39 (Feb. 12, 2014).

[25] Compl. ¶ 11; OB Ex. A at 26–29 (signature pages dated May 8, 2009); OB Ex. B at 26–29 (signature pages).

[26] OB Ex. A Recital ¶ 4; OB Ex. B Recital ¶ 4.

[27] OB Ex. A at 31; OB Ex. B at 32.

[28] *See* Appendix Tabs 5-10, Ex. 10 at Data Column No. 3–4, *Carter Farm LLC v. New Castle County*, C.A. No. 1641-VCG (Del. Ch.), Dkt. 39 (Feb. 12, 2014).

Under the LPAs, NVR's obligation to purchase the lots was conditioned upon (1) the County's grant of final approval of the subdivision plan[29] and (2) completion by September 30, 2012 of the sewage and wastewater system at the heart of Carter Farm's 2005 lawsuit.[30] NVR paid Carter Farm a $500,000 deposit upon execution of the LPAs.[31]

The County approved the Preliminary Plan, with some modifications, on June 30, 2009.[32] Carter Farm submitted a proposed Record Major Subdivision Plan ("LPA Record Plan") to the County in September.[33] The LPA Record Plan listed the Original Parcels and the same conveyance record number as the Preliminary Plan in the land description.[34]

By December of that year, however, Carter Farm believed that its settlement terms with the County were no longer economically feasible, and it proposed that the parties revise the settlement.[35] The County agreed. Negotiations broke down over the wastewater system, which prevented

---

[29] OB Ex. A §§ 3, 6(c), 7(b); OB Ex. B §§ 3, 6(c), 7(b).

[30] OB Ex. A § 17(b); OB Ex. B § 17(b); Compl. ¶¶ 15–16.

[31] Compl. ¶ 14.

[32] OB at 5; *see* Appendix Tabs 16-26, Exs. 16–17, *Carter Farm LLC v. New Castle County*, C.A. No. 1641-VCG (Del. Ch.), Dkt. 41 (Feb. 12, 2014).

[33] Appendix Tabs 16-26, Exs. 18, *Carter Farm LLC v. New Castle County*, C.A. No. 1641-VCG (Del. Ch.), Dkt. 41 (Feb. 12, 2014).

[34] *See* OB Ex. D at Data Column Nos. 3–4 (Tax Parcel Number and Source of Title).

[35] *Carter Farm I*, at *2; OB at 7.

approval of the LPA Record Plan.[36]  While these negotiations were ongoing, Carter Farm provided NVR status updates on the approval procedures[37] and the County confirmed that the Court's status quo order prevented the expiration of the LPA Record Plan.[38]

## V.  The LPAs' September 12 deadline passes.

The September 12, 2012, deadline for completing the sewage and wastewater system for the Property passed with no ground having been broken on the project.  Carter Farm continued its talks with the County until the County's political administration changed in November 2012.[39]  NVR maintains that, despite Carter Farm's failure to meet the conditions under the LPAs, NVR elected not to take action against Carter Farm; it decided to give Carter Farm additional time to obtain the required approvals.[40]  Carter Farm continued to engage with the County through 2013, but to no avail.[41]

---

[36] *Carter Farm I*, at *2.

[37] Compl.  ¶ 24.

[38] Pl.'s Ans. Br., Ex. 14, *Carter Farm LLC v. New Castle County*, C.A. No. 1641-VCG (Del. Ch.), Dkt. 54 (Mar. 26, 2014).

[39] OB at 7.

[40] Compl. ¶ 23.

[41] *Carter Farm I*, at *2.

## VI. The County moves to enforce its 2007 settlement with Carter Farm.

On February 12, 2014, the County filed a motion to enforce the 2007 settlement agreement against Carter Farm. This Court granted the County's motion in July.[42] The Court's decision resolved the litigation and terminated the status quo order.[43] Carter Farm claims that it believed the LPA Record Plan expired by operation of law upon dissolution of the status quo order.[44]

## VII. Carter Farm takes actions inconsistent with the plans for developing the Property under the LPAs.

In 2015 and 2016, Carter Farm took actions inconsistent with the LPAs and the LPA Record Plan. On October 15, 2015, it subdivided the Original Parcels into three separate agricultural lots.[45] This subdivision eliminated all but three of the Original Parcels: 11-061.00-001, 11-061.00-005, and 11-061.00-008. On February 15, 2016, Carter Farm submitted a plan to further subdivide parcel no. 11-061.00-001 to the County for approval.[46] The County

---

[42] *Carter Farm I*, at *2–5.

[43] *Carter Farm I,* at *8–9; *see* Stipulated Status Quo Order ¶ 3, *Carter Farm LLC v. New Castle County*, C.A. No. 1641-VCG (Del. Ch.), Dkt. 11 (May 31, 2007) (stating that the order remained in effect until the matter is resolved).

[44] OB at 8. Under the County code then in effect, a submitted record plan expires if it is not recorded within six months after the date of the first written decision issued by the County. New Castle Cty. C. § 40.31.490(A) (May 30, 2014).

[45] *See g* OB Ex. E; *accord* Parcel Records, *Deed History*.

[46] OB Exs. F–G.

approved the plan, creating tax parcel no. 11-57.00-244 by carving out 2.8 acres from parcel 11-061.00-001.[47] Those actions made constructing the lots in accordance with the LPA Record Plan impossible.

In 2019, Carter Farm conveyed two of the subdivided lots to private parties.[48] NVR alleges it was still in communication with Carter Farm about acquiring the Property at the time of the transfer.[49]

## VIII. NVR's allegations covering the years 2015 to 2019.

After the Court enforced the County's 2007 settlement with Carter Farm, NVR alleges that it expressed an interest in revising the LPAs and continued to discuss the Property with Carter Farm.[50] Specifically, NVR alleges that on May 25, 2017, NVR sent Carter Farm a proposal to amend the LPAs, which Carter Farm rejected.[51] NVR alleges that it continued to discuss the Property with Carter Farm, hoping to reach an agreement.[52]

---

[47] *Id.*; *accord* New Castle Cty., *Parcel Map*, *1105700244*, https://tinyurl.com/yc33 4r7h (last visited Jan. 13, 2026).

[48] OB Ex. H.

[49] Compl. ¶ 24. "The Property," as defined in the LPAs, no longer existed. NVR does not allege that the parties discussed reversing the subdivisions and sales of land or believed that to be possible. Instead, NVR argues that it was not aware of Carter Farm's actions.

[50] *Id.*

[51] *Id.*

[52] *Id.* Because of the subdivisions in 2015 and 2016, "the Property," as defined in the LPAs, no longer existed in 2017. Among the issues in this case is whether the Court may take judicial notice of developments impacting the Property after 2014,

## IX. Carter Farm's 2021 RFP

On January 13, 2021, Carter Farm sent a Request for Proposal ("RFP") to several builders to gauge their interest in purchasing lots "on the Property."[53] The development contemplated in the RFP differed substantially from the LPA Record Plan. For example, it contemplated several multi-family apartments and a substantially different subdivision configuration.[54] Carter Farm submitted an exploratory development plan to the County on May 6, 2021.[55]

NVR received a copy of the RFP. NVR alleges, conclusively, that this was a mistake, and that Carter Farm never intended to share the RFP with NVR.[56] At some point after receiving the RFP, NVR met with Carter Farm. NVR argued that the LPAs were still in effect and Carter Farm could not sell the lots to other developers.[57] NVR does not allege whether or how Carter

and whether NVR was or should have been aware of those developments. *See* AB at 17; RB at 11–15.

[53] Compl. ¶ 25; OB at 9–10; OB Ex. I.

[54] *Contrast* OB Ex. D (the LPA Record Plan) *with* OB Ex. I (the RFP).

[55] OB at 10; OB Ex. J.

[56] Compl. ¶ 25.

[57] *Id.* ¶ 26.

Farm responded, but it alleges that the parties continued to negotiate potential amendments to the LPAs.[58]

## X. Carter Farm conveys property to Choptank Road.

On March 4, 2022, NVR alleges, Carter Farm conveyed the Property to Choptank Road.[59] NVR contends that it was in negotiations with Carter Farm at the time and Carter Farm failed to inform NVR of the conveyance.[60]

Carter Farm submitted two more exploratory plans to the County in 2022.[61] NVR contends that it never saw or approved these plans before submission, as required under the LPAs.[62] Around the time of the 2022 submission, Carter Farm entered into several agreements with the County to resolve their dispute over development of a sewage system.[63]

---

[58] *Id.*

[59] *Id.* ¶ 27. This was not possible because the seven Original Parcels were no longer intact. County records reveal that Carter Farm actually conveyed Parcel Nos. 11-061.00-008, 11-061.00-005, and 11-061.00-001 to Choptank Road. New Castle Cty. Recorder of Deeds, *Public Access, Search, Instrument Id 202203 080027184,* https://newcastle.dts-de.com/PaxWorld/views/search# (last visited Feb. 1, 2026). *Compare id. with* OB Ex. Q (appearing to be identical).

[60] Compl. ¶¶ 27, 29–31.

[61] OB at 10; OB Exs. J–L.

[62] Compl. ¶ 28.

[63] OB at 11; OB Ex. N–O.

## XI. NVR stops bargaining and involves its lawyers.

On September 27, 2023, Carter Farm contacted NVR to request amended lot prices.[64]  The next day, NVR rejected the proposal and informed Carter Farm it would purchase the lots at the "prices previously provided."[65]  NVR alleges that Carter Farm did not respond.[66]  At some point in this period, NVR sent its proposal for a third time.[67]

Carter Farm submitted two proposed record plans to the County, on October 25, 2023, and February 28, 2024, respectively.[68]  On April 23, 2024, Carter Farm and NVR discussed the "amended pricing structure" of the LPAs over the telephone, but Carter Farm did not commit to the terms NVR proposed.[69]

---

[64] Compl. ¶ 29.

[65] *See id.*

[66] *Id.* ¶ 30.

[67] *Id*.

[68] OB at 10; OB Exs. K–L.

[69] Compl. ¶ 31

On August 29, NVR determined that further negotiations with Carter Farm would be futile. NVR sent a notice of default ("Notice") to Carter Farm as required by Section 8(e) of the LPAs.[70] The Notice contained a "chronology of [NVR and Carter Farm's] relationship[,]" of Carter Farm's failures to perform under the LPAs, and of the actions that constitute defaults under the LPAs, including Carter Farm's retention of NVR's $500,000 deposit.[71] The Notice also states that Carter Farm repudiated the LPAs by claiming they were "no longer valid and enforceable and by refusing to develop and sell finished lots to NVR."[72] NVR offered Carter Farm the opportunity to cure the alleged defaults if Carter Farm would "cease and desist from marketing the Property and/or entertaining offers from third parties" to purchase the Property.[73] Carter Farm's response to the Notice denies NVR's contentions and asserts that NVR may not enforce the LPAs.[74]

---

[70] *See id.* ¶ 32; OB Ex. A § 8(e); OB Ex. B § 8(e). The default liability provisions for each LPA are identical. *Compare* OB Ex. A § 8(e) *with* OB Ex. B § 8(e).

[71] Compl. ¶ 32; OB Ex. R.

[72] OB Ex. R.

[73] *Id.*

[74] Compl. ¶ 33 (erroneously numbered ¶ 36).

On September 17, Carter Farm submitted a third proposed record plan to the County.[75]  Seven days later, the County issued a conditional approval to Carter Farm and requested a supplemental record plan.[76]

## XII.  Procedural History

NVR filed its Complaint with this Court on October 14, 2024.[77]  All of its counts stem from the LPAs executed in 2009.[78]  NVR recorded a Lis Pendens on the Property three days after filing the action.[79]

On November 6, Defendants filed a Motion to Dismiss the Complaint and a Motion to Cancel Lis Pendens ("Motions"), accompanied by a consolidated opening brief supporting the Motions.[80]

On December 19, the parties informed the Court that they were actively engaged in settlement discussions and submitted a stipulation and proposed order staying the litigation.[81]  The Court granted the stay the next day.[82]  The parties continued to engage in settlement talks and eventually submitted a

---

[75] OB at 10; OB Ex. L.

[76] OB at 11; OB Ex. P.

[77] *See* Dkt. 1.

[78] *See* Compl. at Counts I–V.

[79] *See* Defs.' Mot. to Cancel Lis Pendens, Dkt. 7.

[80] *See* Dkts. 6–8.

[81] Dkt. 12.

[82] Dkt. 13.

further stipulation and proposed order staying the action indefinitely, which the Court granted on March 21, 2025.[83]

On June 20, 2025, the parties asked the Court to lift the stay and proposed a new briefing schedule on Defendants' Motions.[84] The Court scheduled oral argument for October 22.[85]

On August 15, NVR filed its Answering Brief.[86] On September 19, Defendants filed their Reply Brief.[87] On October 22, the Court heard argument on the Motions and took the matter under advisement.[88]

## ANALYSIS

Defendants moved to dismiss the Complaint pursuant to Court of Chancery Rule 12(b)(6).[89] Defendants contend that NVR's claims are time-barred, or, in the alternative, that NVR has failed to state a claim for which relief may be granted.[90] In conjunction with the Motion to Dismiss, Defendants moved to cancel the Lis Pendens, arguing (1) it is not probable

---

[83] *See* Dkts. 14–21.

[84] Dkts. 23–24, 26–27.

[85] Dkt. 25.

[86] Dkt. 30.

[87] Dkt. 32.

[88] Dkt. 34.

[89] Dkt. 6; OB at 13.

[90] *See generally* OB; RB.

that judgment will be entered in NVR's favor, (2) NVR is not entitled to equitable relief, and (3) NVR failed to comply with the statutory mailing requirements.[91]   In this report, I recommend that the Court dismiss the Complaint and cancel the Lis Pendens because NVR's claims are time-barred.

## I.    The Motion to Dismiss should be granted.

When reviewing a motion to dismiss under Rule 12(b)(6), Delaware courts "(1) accept all well pleaded factual allegations as true[;] (2) accept even vague allegations as 'well-pleaded' if they give the opposing party notice of the claim; [and] (3) draw all reasonable inferences in favor of the non-moving party[.]"[92]  The Court "need not accept conclusory allegations unsupported by specific facts, nor draw unreasonable inferences in Plaintiff['s] favor."[93]

"[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[94]  Delaware courts must "deny the motion unless the plaintiff[s] could not recover under any reasonably

---

[91] OB at 14–15 (citing 25 *Del. C.* §§ 1605–06, 1608).

[92] *Fitzgerald v. Fitzgerald Home Farm, LLC*, 2024 WL 1071970, at *2 (Del. Ch. Mar. 12, 2024) (citing *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011)).

[93] *Richardson v. New Res Mortg. Loan Tr. 2019RPL3*, 2025 WL 2491199, at *4 (Del. Ch. Aug. 29, 2025) (citing *Garfield ex rel. ODP Corp. v. Allen*, 277 A.3d 296, 319 (Del. Ch. 2022)).

[94] *Cent. Mortg. Co.*, 27 A.3d at 537.

conceivable set of circumstances."[95] Further, "because motions to dismiss are limited to facts appearing on the face of the pleadings, 'affirmative defenses, such as laches, are not ordinarily well-suited for treatment on such a motion.'"[96] "[D]ismissal on an affirmative defense like laches is inappropriate '[u]nless it is clear from the face of the complaint that an affirmative defense exists and that the plaintiff can prove no set of facts to avoid it.'"[97]

Defendants argue that the Court should dismiss NVR's claims for two reasons. First, Defendants contend that NVR's claims are time-barred by the statute of limitations or the doctrine of laches. Alternatively, Defendants assert that NVR has failed to state a claim for relief. Defendants submitted multiple exhibits to support their arguments, but NVR argues that it would be improper for me to consider them on a Motion to Dismiss.[98] I address NVR's

---

[95] *Richardson*, 2025 WL 2491199, at *4 (quoting *Cent. Mortg. Co.*, 27 A.3d at 536).

[96] *Otto Candies, LLC v. KPMG LLP*, 2019 WL 994850, at *28 (Del. Ch. Feb. 28, 2019) (quoting *Reid v. Spazio*, 970 A.2d 176, 183–84 (Del. 2009)).

[97] *Otto Candies*, 2019 WL 994850, at *28 (quoting *Spazio*, 970 A.2d at 183–84). *See also In re General Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 167–71 (Del. 2009) (affirming the Court of Chancery's decision to take judicial notice of "publicly available facts" in a 10-Q filing when granting a 12(b)(6) motion to dismiss when plaintiff did not contest its authenticity). I note that NVR does not contest the authenticity of Defendants' exhibits, it only argues their *contents* cannot be taken as true or that they are irrelevant. *See, e.g.*, AB at 12 ("The details contained in these documents are often subject to differing interpretations . . . .").

[98] *See* AB at 9–13.

– 17 –

arguments concerning Defendants' exhibits before turning to the parties' substantive arguments regarding dismissal.

### A. The Court may properly take judicial notice of Defendants' exhibits.

NVR asserts that Defendants improperly attached "external materials" to their Motions and that the Court may not consider them.[99]  Defendants argue that the authority NVR cites does not support its arguments.[100]  I concur with Defendants.

Delaware Rules of Evidence 201 and 202 govern when this Court may take judicial notice of adjudicative facts or of law.[101]  Under Rule 201 the Court may take judicial notice of facts that are not subject to reasonable dispute because they are "generally known within the . . . [C]ourt's territorial jurisdiction"[102] or they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."[103]  Under Rule 202, the Court "must take judicial notice of the United States Constitution, case law relating thereto, and the Constitution, common law, case law and

---

[99] *See* AB at 9–10; Tr. 26:06–28:04.

[100] *See* RB at 3–6.

[101] *See* D.R.E. 201–02.

[102] D.R.E. 201(b)(1).

[103] D.R.E. 201(b)(2).

statutes of" Delaware.[104]  The Court may also take judicial notice of federal law and the law of other states.[105]  Finally, the Court may, with or "without request by a party," take judicial notice of the "determinations of governmental subdivisions" in Delaware,[106] "the records of the court in which the action is pending[,] and any other court" in Delaware.[107]

NVR argues that Defendants improperly relied on three categories of evidence: (1) other pleadings and settlement agreements, (2) plans and county reviews, and (3) negotiations between Carter Farm and the County.  I address each category below.

### 1.    The Court may take judicial notice of the pleadings and settlement agreements.

NVR argues that Defendants "reference pleadings, settlement agreements, and amended complaints from" *Carter Farm I*, but that Rules 201(b) and 202(b) preclude the Court from considering them.[108]  Specifically, NVR notes that "a fact may only be judicially noticed if it is generally known or capable of accurate and ready determination by resorting to sources whose

---

[104] D.R.E. 202(a).

[105] *See* D.R.E. 202(a)(1).

[106] D.R.E. 202(d)(1)(B).

[107] D.R.E. 202(d)(1)(C).

[108] AB at 10 (citing D.R.E. 201(b), 202(b)).

accuracy cannot be reasonably questioned."[109] NVR argues that the filings Defendants cite fail to meet this standard because they "contain contested facts" and that "judicial notice does not extend to legal pleadings and settlement documents" because such documents "are naturally subject to dispute, contain contested facts, and are not universally known or easily verifiable."[110] NVR concludes that the accuracy of these documents is not capable of being verified at the pleading stage, therefore, the Court may not consider them when ruling on the Motions. NVR is incorrect.

To begin, *Carter Farm I* was litigated in the Court of Chancery; the filings in the case are eligible for consideration under Rule 202(b).[111] And, although NVR is correct that the Court may not take judicial notice of court filings "for the truth of their contents," the Court may take judicial notice of the filings for other purposes. These include "to discern when the document was created, what was said therein, or what notice was provided thereby," and "'to understand the nature and grounds for rulings made by the court in which

---

[109] *Id.*

[110] *Id.* at 10–11.

[111] D.R.E. 202(b) (permitting Court to take judicial notice of "the records of the court in which the action is pending[.]").

– 20 –

the documents were filed.'"[112]  Defendants' citations to *Carter Farm I* are limited to the contents of Court's orders, factual findings, and the evidence upon which the Court relied to resolve the motion presented in *Carter Farm I*.[113]  I find that Defendants' citations to the record in *Carter Farm I* may be considered for the limited purpose of understanding the grounds for this Court's prior holding in a related action.

NVR also argues that the Court may not take judicial notice of the settlement between Carter Farm and the County.  NVR relies on the same rationale it advanced in connection with Court records; namely, that judicial notice does not apply to settlements because their contents are subject to reasonable dispute.  This argument lacks merit.

This Court enforced the settlement against Carter Farm and the County in *Carter Farm I*.[114]  The Court is required to take judicial notice of *Carter Farm I* under Rule 202(a), which must include, at least, the fact that the settlement exists and that the parties were bound by it.[115]  The Court may also

---

[112] *Indemnity Insur. Co., RRG v. Cohen*, 2018 WL 487246, at *1 (Del. Ch. Jan. 18, 2018) (citing and quoting *In re Rural Metro Corp. S'holders Litig.*, 2013 WL 6634009, at *7–9 (Del. Ch. Dec. 17, 2013)).

[113] *See, e.g.*, OB at 5 (citing to exhibits submitted to the Court for the pending motion to enforce a settlement).

[114] *See Carter Farm I* at *1, *4–9.

[115] "Every court in this State must take judicial notice of . . . [the] case law" of Delaware.  D.R.E. 202(a).

be able to take judicial notice of the settlement's terms if they formed the basis of the Court's ruling and if, under the circumstances, the accuracy of the terms "cannot be reasonably questioned." The Court's discussion of the settlement may also be judicially noticed to discern what notice was provided to others when the Court issued its ruling.[116]

The Court takes judicial notice of the factual findings and holdings of *Carter Farm I*, and the underlying records the Court used to support its conclusions to determine what notice may have been provided to NVR. Specifically, the Court takes judicial notice of the date *Carter Farm I* was decided and made publicly available, what the Court said in its ruling regarding the settlement, the records used to support the Court's findings of fact and conclusions of law, and the contents of the settlement outlined in the Court's opinion.

### 2. The Court may take judicial notice of the submitted plans and County reviews.

NVR also asserts that the Court cannot consider the "exploratory plans, preliminary plans, and decisions made by" the County.[117] NVR contends that these documents are not "universally accepted facts that are capable judicial

---

[116] *See Indemnity Insur. Co.*, 2018 WL 487246, at *1 (citing *Rural Metro Corp.*, 2013 WL 6634009, at *7–9).

[117] AB at 11–12; Tr. 27:7–27:19.

notice" and that they are not relevant evidence.[118]  Defendants dispute these characterizations, arguing that they do not rely on the records for the truth of their contents, but only to show that they were publicly available and when NVR should be considered to have constructive notice.[119]

Documents may be judicially noticed to "discern when the document was created, what was said therein, or what notice was provided thereby[.]"[120] And "Delaware courts have taken judicial notice of publicly available documents that 'are required by law to be filed, and are actually filed, with federal or state officials.'"[121]  Defendants cite to these records to support their contention that NVR had notice of facts that reasonably should have prompted it to investigate Carter Farm's activities.[122]  This Court may take judicial notice of records publicly recorded with Recorder of Deeds.[123]  Defendants do not, as NVR avers, ask the Court to accept the details of these records in

---

[118] AB at 11–12; Tr. 27:1–27:22.

[119] *See* RB at 4–5.

[120] *Indemnity Insur. Co.*, 2018 WL 487246, at *1 (citing *Rural Metro Corp.*, 2013 WL 6634009, at *7–9).

[121] *Rural Metro Corp.*, 2013 WL 6634009, at *7

[122] *See, e.g.*, OB at 8 ("With NVR's Knowledge, Carter Farm Moves Ahead Alone . . . . This was no secret to NVR.").

[123] *See, e.g.*, *Talley v. Horn*, 2022 WL 4963256, at *1 n.2 (Del. Ch. Oct. 4, 2022) (citing *Sunrise Ventures, LLC v. Rehoboth Canal Ventures, LLC*, 2010 WL 363845, at *10 n.58 (Del. Ch. Jan. 27, 2010)).

their briefing. The information in County records is subject to judicial notice under Rule 201 for the purpose of determining when the documents were filed and what notice their contents may have provided to NVR.

The Court also finds these documents to be relevant. Evidence is relevant if it has "any tendency to make a fact more or less probable" and "the fact is of consequence in determining the action."[124] These documents are relevant because they make the fact that NVR could have discovered its claims sooner had it perceived these red flags more probable, and they relate directly to the claims at issue—whether NVR waited too long to bring suit and whether the Court can grant the relief NVR seeks. The Court takes judicial notice of the submitted plans and County reviews for the limited purpose of understanding when they were created or submitted, what was said therein, and what notice they may have provided.

### 3. The Court may take judicial notice of Defendants' negotiations with the County.

Lastly, NVR objects to Defendants "cit[ing] their history of negotiations" with the County "regarding a regional sewer system and other development matters."[125] NVR asserts that the "underlying facts and

---

[124] D.R.E. 401.

[125] AB at 12.

positions of the parties in negotiations" are contested and "not appropriate for judicial notice."[126] The references to these negotiations in Defendants' brief are only used to establish that such negotiations occurred.[127] NVR explicitly concedes that those negotiations may be used to establish that there was a dispute between Carter Farm and the County.[128] I, therefore, take judicial notice of the fact that Carter Farm and the County engaged in negotiations for the limited purposes of finding that a dispute existed, and the parties engaged in discussions. I do not take as true the purported substance of the negotiations or each side's alleged positions and beliefs.

### B. NVR's claims should be dismissed as untimely.

Defendants maintain that all of NVR's claims should be barred by laches, because claims arising from a contractual right must typically be brought within three years of the alleged breach.[129] Defendants assert that NVR's claims arose in 2014, when the status quo order dissolved, and the

---

[126] *Id.*

[127] *See* OB at 7–8. Also, as previously discussed, the Court may take judicial notice of this Court's discussion of the negotiations in *Carter Farm I* to understand and evaluate its ruling.

[128] *See* AB at 12 ("[T]he only 'fact' that such negotiations could establish was the existence of a dispute and that Defendants and [the] County resolved that dispute amicably.").

[129] OB at 16–18; RB at 6–8; Tr. 4:4–4:22.

LPA Record Plan expired.[130] Defendants contend that NVR should have filed this action by July 2017.[131] Alternatively, Defendants argue that NVR's claims accrued no later than the date of the final breach alleged in NVR's complaint, May 2021.[132] Even by that standard, Defendants argue, NVR's action is untimely.[133]

NVR vigorously disputes Defendants' reasoning and argues that its contractual claims are timely for four reasons. First, NVR maintains that the LPAs did not expire in 2014.[134] Second, NVR argues that the LPAs are "continuous contracts," and the statute of limitations did not begin to run until the parties' contractual relationship terminated.[135] Third, NVR argues that the statute of limitations was tolled until it became aware of Carter Farm's conveyance of "the Property" to Choptank, recorded on March 8, 2022.[136] Fourth, and finally, NVR suggests that an equitable tolling doctrine should apply to its breach of contract and tortious interference claims.[137]

---

[130] OB at 17.

[131] OB at 18.

[132] OB at 18.

[133] *Id.* at 18–19; RB at 11–14.

[134] AB at 18–22.

[135] *Id.* at 23, 24–25.

[136] *Id.* at 27.

[137] *Id.* at 24–25.

"For a court to grant a Rule 12(b)(6) motion on timeliness grounds, the complaint's allegations must show that the claim was filed too late."[138] "Under Delaware law, there are two methods the [C]ourt uses to analyze the timeliness of a claim: the statute of limitations and the doctrine of laches."[139] "When a plaintiff has advanced a legal claim and seeks a form of relief that is available from a court at law, such as monetary damages, then the court will apply the statute of limitations in the same manner as a law court."[140] "If a plaintiff has presented a court of equity with an equitable claim or if the plaintiff has sought equitable relief, then the court will apply the doctrine of laches."[141]

"Although both laches and statutes of limitation operate to time-bar suits, the limitations of actions applicable in a court of law are not controlling in equity."[142] "Under ordinary circumstances, a suit in equity will not be

---

[138] *Lebanon Cty.*, 287 A.3d at 1193 (citing *Kahn v. Seaboard Corp.*, 625 A.2d 269, 277 (Del. Ch. 1993)).

[139] *Richardson*, 2025 WL 2491199, at * 9 (citing *Lebanon Cty. Emplys.' Ret. Fund v. Collis*, 287 A.3d 1160, 1194 (Del. Ch. 2022)).

[140] *Lebanon Cty.*, 287 A.3d at 1194 (citing *Perkins v. Cartmell*, 1845 WL 493, at *5 (Del. June 1845)).

[141] *Lebanon Cty.*, 287 A.3d at 1194 (citing Donald J. Wolfe & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 15.07[d] (T. Brad Davey et al., eds. 2d ed. 2024)).

[142] *Reid v. Spazio*, 970 A.2d 176, 183 (Del. 2009) (citing *Adams v. Jankouskas*, 452 A.2d 148, 157 (Del. 1982)).

stayed for laches before, and will be stayed after, the time fixed by the analogous statute of limitations at law[.]"[143]  The Court often applies the statute of limitations by analogy in a laches analysis.[144]  Therefore, "[a] filing after the expiration of the analogous limitations period is presumptively an unreasonable delay for purposes of laches."[145]

Because claims for breach of contract under a continuous contractual obligation and a standard contractual obligation may ripen at different times, I first determine whether NVR's contractual claims fall under the continuing breach exception.  I then analyze the timeliness of NVR's claims.

### 1. The continuing breach exception does not apply to NVR's claims.

"Statutes of limitations generally do not begin to run 'until all of the elements of the claim have occurred.'"[146]  "A cause of action for breach of contract accrues when the contract is broken, not when actual damage results

---

[143] *Spazio*, 970 A.2d at 183 (quoting *Wright v. Scotton*, 121 A. 69, 72–73 (Del. Jan. 16, 1923)).

[144] *See generally Kraft v. WisdomTree Invests., Inc.*, 145 A.3d 969, 978–93 (Del. Ch. 2016) (discussing the analytical framework of a laches claim).

[145] *Lebanon Cty.*, 287 A.3d at 1195 (quoting *Levey v. Brownstone Asset Mgmt., LP*, 76 A.3d 764, 769 (Del. 2013)).

[146] *AM Gen. Hldgs. LLC v. The Renco Gp., Inc.*, 2016 WL 4440476, at *11 (Del. Ch. Aug. 22, 2016) (quoting *Price v. Wilm. Tr. Co.*, 1995 WL 317017, at *2 (Del. Ch. May 19, 1995)).

or is ascertained."[147]  Neither party disputes this.[148]  NVR filed its complaint on October 14, 2024.[149]  Therefore, to avoid a time bar, NVR's claims must have accrued on or after October 14, 2021.[150]

Defendants assert that the LPAs expired or were abandoned in 2014 "when neither party could fulfill their obligations under the LPAs[.]"[151]  At the latest, Defendants argue, NVR's claims accrued when Carter Farm filed the last exploratory plan with the County, in May 2021.[152]  NVR contends that the continuing breach exception should apply because the LPAs never expired and they expressly "contemplate a continued obligation by Carter Farm to" attempt to meet its obligations under the LPAs.[153]

---

[147] *Davis, Bowen & Friedel, Inc. v. Disabatino*, 2016 WL 7469691, at *4 (Del. Super. Dec. 27, 2016) (citing *Worrel v. Farmers Bank*, 430 A.2d 469, 472 (Del. 1981)).

[148] OB at 16; AB at 23.  *See, e.g.*, *AM Gen. Hldgs.*, 2016 WL 4440476, at *11 (citing *Smith v. Mattia*, 2010 WL 412030, at *4 (Del. Ch. Feb. 1, 2010)).

[149] *See* Dkt. 1.

[150] *See* Dkt. 1; 10 *Del. C.* § 8106.  Section 8106(c) does not apply in this instance because the LPAs do not contain a "period specified in" them that permits them to bring suit.

[151] OB at 18; *see also* RB at 6–9; Tr. 9:3–11:13.

[152] *See* OB at 18; Tr. 13:20–14:8.

[153] AB at 16; *see also* AB at 24–28; Tr. 38:13–38:20 (arguing the LPAs express a continuing obligation).

– 29 –

"If the continuing breach exception applies . . . the statute begins to run the moment 'full damages can be determined and recovered,' which may not happen until the contract terminates."[154]  The continuing breach doctrine, however, is typically "applied only in unusual situations."[155]  It is NVR's burden to prove the doctrine applies in this case.[156]

"To determine whether a breach (or series of breaches) is 'continuing,' Delaware courts consider whether the breach(es) can be divided such that the 'plaintiff could have alleged a *prima facie* case for breach of contract . . . after a single incident.'"[157]  "If such a case can be made, the contract is severable, 'even when confronted with numerous repeated wrongs of similar, if not the same, character over an extended period.'"[158]

---

[154] *AM Gen. Hldgs.*, 2016 WL 4440476, at *11 (citations omitted).

[155] *Desimone v. Barrows*, 924 A.2d 908, 924–25 (Del. Ch. 2007) (referred to as the "continuing wrong doctrine").

[156] *See, e.g.*, *Davis, Bowen & Friedel*, 2016 WL 7469691 at *4 (citing *Fike v. Ruger*, 754 A.2d 254, 261 (Del. Ch. 1999), *aff'd*, 752 A.2d 112 (Del. 200)).

[157] *AM Gen. Hldgs.*, 2016 WL 4440476, at * 12 (quoting *Price*, 1995 WL 317017, at *2).

[158] *Davis, Bowen & Friedel*, 2016 WL 7469691, at *4 (quoting *AM Gen. Hldgs.*, 2016 WL 4440476, at * 12).

NVR's claims arise from the LPAs.  NVR alleges Carter Farm breached the LPAs by transferring title of the Property to Choptank,[159] submitting record plans to the County that revised the LPA Record Plan without NVR's approval,[160] failing to perform its obligations under the LPAs,[161] issuing the RFP and seeking to sell the Property to third parties,[162] and repudiating the LPAs.[163] Finally, NVR alleges Choptank tortiously interfered with NVR's rights under the LPAs.[164]  Several provisions of the LPAs bear on NVR's claims:  Section 4,[165] Section 6,[166] Section 8,[167] Section 9,[168] Section 12,[169] and Section 17.[170]

---

[159] Compl. ¶¶ 34–35 (erroneously numbered 37–38).

[160] *Id.* ¶¶ 42–45 (erroneously numbered 44–47).

[161] Specifically, failing to perform development work to prepare the lots in accordance with the LPAs. *See* Compl. ¶ 55; OB Ex. A § 4 (requiring Carter Farm to clear and grade the Lots, complete base paving, and construct storm drainage structures).

[162] Compl. ¶¶ 54 (56), 61 (63); OB Ex. A § 8(e); OB Ex. B § 8(e).

[163] Compl. ¶¶ 54–55 (56–57), 61–64 (63–66).

[164] *Id.* ¶¶ 67–70 (69–72).

[165] *Id.* ¶¶ 15–16; OB Ex. A § 4; OB Ex. B § 4.

[166] Compl. ¶ 17; OB Ex. A § 6; OB Ex. B § 6.

[167] Compl. ¶ 20; OB Ex. A § 8; OB Ex. B § 8.

[168] OB Ex. A § 9; OB Ex. B § 9.

[169] OB Ex. A § 12; OB Ex. B § 12; *see also* Compl. ¶ 19.

[170] Compl. ¶ 23; OB at 3–8; OB Ex. A § 17; OB Ex. B § 17.

Section 4 lays out Carter Farm's obligations to improve the lots on the Property.[171] Relevant to this dispute are subsections (d) and (j), which state, respectively:

> 4(d) <u>Water and Sewer Mains</u>. [Carter Farm] shall install water and sewer mains in the street or in the rear of each Lot with laterals with the Lot lines and shall clearly mark the same. [Carter Farm] shall pay any allocation or, off-site charges. [Carter Farm] shall furnish written evidence of the paid fees and written evidence that such are transferable from [Carter Farm] to [NVR] at no cost to [NVR].[172]
>
> 4(j) <u>Performance of Work.</u> The development obligations provided for above, which are required for the issuance of building permits for [NVR]'s improvements shall be completed by September 30, 2012. Private utilities shall be installed be no later than September 30, 2021. In the event [Carter Farm] fails to meet any of the aforementioned dates, [NVR] shall have the right, in addition to any other remedies under this Agreement, to (i) terminate this Agreement and Seller shall return the Deposit to [NVR] withing five (5) days of such termination**, or (ii) extend such dates for a reasonable period of time** for [Carter Farm] to complete the required actions.[173]

---

[171] *See* OB Ex. A § 4; OB Ex. B § 4.

[172] OB Ex. A § 4(d); OB Ex. B § 4(d).

[173] OB Ex. A § 4(j)(emphasis added); OB Ex. B § 4(j).

Section 6 lists conditions precedent to settlement. Under Section 6, NVR would only be obligated to purchase the Property if all of the express conditions were met.[174] One such condition to settlement was that

> [Carter Farm] has completed its improvements as to the Lots including, but not limited to, base paving, such other matters as described in [Section] 4 and correction of the deficiencies listed on the Lot Inspection Report.[175]

Section 8 of the LPAs outlines each party's liability in the event of default. Section 8(e) specifies that

> No failure(s) or default(s) by [NVR] or [Carter Farm], including failure to timely exercise options, shall result in the termination or limitation of any right hereunder or the exercise of any rights or remedies with respect to such failure(s) or default(s) unless and until [Carter Farm] or [NVR] shall have been notified in writing by a document specifically entitled "Notice of Default" and shall have failed to remedy the specified failure(s) or default(s) . . . . The scope of the breach or default and of the required cure shall be limited to the failure(s) or default(s) specifically stated in the Notice of Default, and any right to claim or pursue a breach of or default under this Agreement following any such failure to cure shall be limited to the specific failure(s) or defaults(s) stated in such Notice of Default.
>
> Notwithstanding any of the foregoing in this Sub[section] 8(e), any attempt by [Carter Farm] to sell, offer the Property for sale, or to otherwise

---

[174] OB Ex. A § 6; OB Ex. B § 6.

[175] OB Ex. A § 6(b); OB Ex. B § 6(b).

– 33 –

market the Property, to any third party shall constitute an immediate default for which there shall be no right to cure and for which [NVR] shall be entitled to immediately exercise its default remedies hereunder without notice to [Carter Farm].[176]

Section 9 required Carter Farm to obtain "all appropriate governmental approvals . . . with respect to the Property."[177]

Section 12 contains miscellaneous provisions. Subsection (d) is relevant here. It states that

> [NVR] shall have the right to review and approve or disapprove any and all changes made to the proposed, submitted and/or approved development documents, including but not limited to, plans, designs, and drawings, including site plans, construction (all types), landscape improvements (trees, shrubs, fences and walls) and covenants, restrictions and easements of record. Any changes made without [NVR]'s approval shall at the election of [NVR] be a default by [Carter Farm] under this Agreement, without opportunity to cure. The parties agree that any revised Lot configuration and/or change in the Lot yield arising from any such revies development documents shall, if modifying the anticipated Record Plan, constitute the Lots that are the subject of this Agreement. [Carter Farm] shall meet and confer with [NVR] on a regular basis, but no less than every two (2) months, to

---

[176] OB Ex. A § 8(e); OB Ex. B § 8(e).

[177] OB Ex. A § 9(f); OB Ex. B § 8(f).

review the anticipated schedule and sequence of development of the Property.[178]

Finally, Section 17 outlines additional costs that would be incorporated into the final purchase price in the agreement. Section 17(b) states that

> [Carter Farm] will construct on the Property a Wastewater Treatment Plant ("WTP") to service both the Carter Farm and Country Club Estates communities. The WTP will be approved by both the Delaware Department of Natural Resources and Environmental Control (DNREC) and the County and subject to regulation by the Public Service Commission (PSC). [NVR] shall reimburse [Carter Farm] at the settlement of each Lot, [$9,815.00] per Lot representing the Capital Recover Fee for the WTP, paid by [Carter Farm] in advance to the County.[179]

Based on the allegations in the Complaint, I conclude that NVR could have made a *prima facie* showing of breach or made a full assessment of its damages at several different points. The first was after Carter Farm failed to take any steps, such as returning NVR's deposit, in response to the dissolution of the status quo order and expiration of the LPA Record Plan in 2014.[180] NVR's allegation that Carter Farm "was not able to get approval"[181] from the

---

[178] OB Ex. A § 12(d); OB Ex. B § 12(d).

[179] OB Ex. A § 17(b); OB Ex. B § 17(b).

[180] *Carter Farm I*, at *8–9; New Castle Cty. C. § 40.31.390.

[181] Compl. ¶ 23.

County and judicially noticeable facts indicate the LPA Record Plan expired in 2014 when the Court issued *Carter Farm I*.

The County Code then in effect states that "[t]he expiration time limits of a land use application decision contained in Table 40.31.390 shall commence on the date of the first written decision within each stage of the application review process."[182]  Table 40.31.390 states that a "Record Plan Submission" must be recorded six months after the County issues a written decision on the submission, or else it expires.[183]  The County Recorder of Deeds indicates no such plan was ever recorded.[184]  Even if the LPA Record Plan didn't expire immediately after the status quo order was vacated, it would need to be recorded by September 17, 2014—six months after the status quo order was dissolved.[185]

---

[182] New Castle Cty. C. § 40.31.390(A) (May 30, 2014).

[183] *Id.* at Table (titled "Time Limits").

[184] *See* Parcel Records, Related Project Plans 20080150 (dated Sep. 18, 2009, status "Inactive"), 2016210285 (dated Feb. 5, 2016, status "Recorded") (last visited Jan. 14, 2026).  The records indicate that no other plans were submitted between these dates, and the submissions appear to be the exhibits Defendants submitted with their briefs.  *Compare* Parcel Records, Related Project Plans 20080150 *with* OB Ex. D; *compare* Parcel Records, Related Project Plans 2016210285 *with* OB Ex. G.

[185] *See Carter Farm I* (ruling the matter was settled by the parties); Stipulated Status Quo Order ¶ 7, *Carter Farm LLC v. New Castle County*, C.A. No. 1641-VCG (Del. Ch.), Dkt. 11 (May 31, 2007) ("The Order shall remain in effect until . . . the matter is otherwise resolved by the parties").

The second point at which NVR could have established a *prima facie* case was when Carter Farm divided the Property, including the Original Parcels listed in the LPAs,[186] into agricultural subdivisions, in 2015.[187] The third point was when Carter Farm conveyed part of the Property to a third party in 2019.[188] The fourth was when Carter Farm marketed part of the Property to third parties via the RFP in January 2021.[189] The last was when Carter Farm submitted a new subdivision plan to the County the following May, after NVR was in possession of the RFP and was aware that Carter Farm was actively marketing the remainder of the Property.[190]

NVR is correct that the LPAs allow it to grant extensions of time to Carter Farm to cure breaches of Section 4 that are "required for the issuance of building permits[;]" violations outlined in Section 8(e) constitute immediate breaches and allow no right to cure.[191] Nowhere, however, does a

---

[186] OB Ex. B at *1 (recitals section listing the parcels), Ex. A-1 (referring to the "First Recital" as the legal description of the Property).

[187] OB Ex. E (dated Oct. 15, 2015).

[188] OB Ex. H (recorded deed dated Apr. 10, 2019, evidencing the conveyance).

[189] OB Ex. I. The RFP is integral to NVR's allegations and is therefore incorporated into the complaint by reference. *See* Compl. ¶¶ 25–26, 54 (56), 61–62 (63–64).

[190] Compl. ¶ 28.

[191] *See* OB Ex. A § 4(j); OB Ex. B § 4(j).

provision of the LPAs allow an extension beyond a "reasonable period."[192] In my view, a "reasonable period" would be no longer than three years—the statute of limitations period chosen by the legislature.[193] The decade or more that NVR waited in this case is not a "reasonable period." During those years, Carter Farm subdivided and conveyed pieces of the property to third parties; they likely would not have done so if NVR had diligently enforced its rights.[194]

At any of the points listed, NVR could have brought suit and pleaded a *prima facie* case for breach of contract. To make its case, NVR would have needed to adequately plead "(1) the existence of a contract; (2) that the contract was breached; and (3) that damages were suffered as a result of the breach."[195] Neither party disputes that a contract exists. Accepting, *arguendo*, NVR's argument that the LPA Record Plan did not expire, Carter

---

[192] *See* OB Ex. A § 4(j); OB Ex. B § 4(j). "Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning." *Stream TV Networks, Inc. v. See Cubic, Inc.*, 279 A.3d 323, 336 (Del. 2022).

[193] *See* 10 *Del. C.* § 8106; *PXP Producing Co. LLC v. MitEnergy Upstream LLC*, 342 A.3d 402, 408 (Del. Ch. 2025) (citing *Kraft*, 145 A.3d at 974–75) ("Statutes of limitations reflect a legislative determination that the claim must be timely pursued.").

[194] *See, e.g.*, OB Ex. H (Deed from Carter Farm to four individuals, dated April 10, 2019).

[195] *LG Elecs. Inc. v. Invention Inv. Fund I, L.P.*, 2024 WL 4675050 (Del. Super. Ct. Sept. 25, 2024).

Farm breached the LPA when it failed to complete the improvements required in Section 4 by the deadline, when it subdivided the Property NVR contracted to purchase, and when it marketed and sold portions of the Property to other parties. NVR suffered damages because it could not receive the full consideration for which it contracted. Accordingly, I conclude that NVR has failed to establish that the continuing breach exception applies.

### 2. Count IV is time-barred by the statute of limitations.

Count IV of the complaint is a breach of contract claim for damages: a legal claim seeking legal relief.[196] "When a plaintiff has advanced a legal claim and seeks relief that would be available from a court at law, then the court will apply the statute of limitations in the same manner as a law court."[197] "Determining whether a claim is time-barred by a statute of limitations requires determining three things: (1) the date the cause of action accrued, (2) whether the cause of action has been tolled, and (3) if the cause of action has been tolled, whether and when Plaintiffs were placed on inquiry

---

[196] Compl. ¶¶ 58–65 (60–67); *Kraft*, 145 A.3d at 975 ("Legal claims seeking legal relief—for instance, a breach of contract claim requesting money damages . . . .").

[197] *West Palm Beach Firefighters' Pension Fund v. Moelis & Co.*, 310 A.3d 985, 993 (Del. Ch. 2024) (citing *Perkins v. Cartmell*, 1845 WL 493, at *5 (Del. June 1845)).

notice of their claims."[198]  As noted above, the latest date the cause of action accrued was May 6, 2021, more than three years before NVR filed the Complaint.

The parties dispute whether the statute of limitations was tolled. Defendant generally argues that it took multiple, public acts and made public filings that put NVR on constructive notice of its claims between 2014 and 2021.[199]  NVR argues that none of the acts or public filings put NVR on notice because the parties continued to have discussions that gave NVR comfort.[200]

NVR identifies three potential tolling doctrines in support of its argument,[201] but the theory NVR appears to rely upon is fraudulent concealment.[202]  As Plaintiff argues:  "To toll the statute of limitations under fraudulent concealment, the plaintiff must allege some affirmative act by the defendant 'that either prevented the plaintiff from gaining knowledge of material facts or led the plaintiff away from the truth.'"[203]  If the statute of

---

[198] *Acme Mkts., Inc. v. Oekos Kirkwood, LLC*, 2023 WL 4873317, at *4 (Del. Ch. July 31, 2023) (citation omitted).

[199] *See* OB at 18–21.

[200] *See* AB at 24 ("Although Carter Farm defaulted under the LPA numerous times over the years, NVR worked with it to continue negotiations and cure the defaults.").

[201] *See* AB at 24–28.

[202] *See* AB at 17, 19, 24.

[203] AB at 24 (quoting *In re Tyson Foods, Inc. Consol. S'holders Litig.*, 919 A.2d 563, 585 (Del. Ch. 2007)).

limitations was tolled, as NVR argues, it would have been so only until NVR knew or should have known of the breach.[204]

"A [plaintiff] is on inquiry notice when they objectively are aware of facts 'sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery' of facts constituting the basis of the cause of action."[205] "Inquiry notice does not require that a plaintiff be aware 'of all of the aspects of the alleged wrongful conduct.'"[206] In essence, a plaintiff must be aware of facts that rise to the level of "red flags" that would lead a prudent person of ordinary intelligence to investigate a possible claim.[207]

I conclude that NVR was on inquiry notice of its claims no later than January 2021, when it became aware of the RFP.[208] Assuming, *arguendo*, that the LPAs had not expired, Defendant's issuance of the RFP constituted

---

[204] *Durkin Contracting, Inc. v. City of Newark*, 2020 WL 2991778, at *8 (Del. Super. June 4, 2020) (collecting cases).

[205] *Ocimum Biosolutions (India) Ltd., v. AstraZeneca UK Ltd.*, 2019 WL 6726836, at *9 (Del Super. Dec. 4, 2019) (quoting *Coleman v. Pricewaterhousecoopers, LLC*, 854 A.2d 838, 842–43 (Del. Super 2004)).

[206] *Ocimum*, 2019 WL 6726836, at *9 (quoting *In re DeanWitter P'rship Litig.*, 1998 WL 442456 (Del. Ch. July 17, 1998)).

[207] *Ocimum*, 2019 WL 6726836, at *9–10 (collecting cases).

[208] *See* Compl. ¶ 25; OB Ex. I (RFP dated Jan. 13, 2021).

an incurable breach.[209] NVR concedes that was aware of this breach but argues that the statute of limitations did not begin to run because Defendant induced NVR to take no action to protect its rights by making "fraudulent representations."[210]

The allegations of the Complaint do not support NVR's argument. The Complaint alleges that "during a subsequent meeting" *NVR told Carter Farm* that the LPAs remained in effect and that Carter Farm "could not sell the lots to another builder." The Complaint does not allege any response from Carter Farm. Rather, the Complaint alleges: "This caused continued negotiations of potential new terms on the LPAs."[211]

On a motion to dismiss, the Court need not accept conclusory allegations unsupported by specific facts. NVR's claim of fraudulent concealment following its receipt of the RFP is conclusory. "Claims of fraudulent concealment are subject to a heightened pleading standard and

---

[209] *See* OB, Ex. A § 8(e) ("any attempt by [Carter Farm] to sell . . . or otherwise market the Property to any third party shall constitute an immediate default for which there shall be no right to cure . . . ."). *See also* OB, Ex. B § 8(e) (containing identical language.)

[210] AB at 26–27.

[211] Compl. ¶ 26.

must be 'stated with particularity'" under Court of Chancery Rule 9(b).[212] "To satisfy Rule 9(b) and thus repel a 12(b)(6) dismissal motion, the claimant must allege '(1) the time, place, and contents of the false representation; (2) the identity of the person making the representation; and (3) what the person intended to gain by making the representation.'"[213] NVR's allegations do not meet this standard. The Complaint does not allege a single representation from Carter Farm. It alleges statements made by NVR followed by alleged "negotiation of potential new terms."[214] This is insufficient to support a claim for fraudulent concealment.

Even if I were permitted to assume that Carter Farm made statements designed to deter NVR from taking legal action, I could not conclude that NVR reasonably relied upon them. NVR claims to have been in negotiations

---

[212] *In re Côte d'Azur Est. Corp.*, 2022 WL 4392938, at *51 (Del. Ch. Sept. 19, 2022) (quoting *In re Est. of Lambeth*, 2018 WL 3239902, at *4 (Del. Ch. July 2, 2018)); Ct. Ch. R. 9(b).

[213] *E.g., Surf's Up Legacy P'rs., LLC v. Virgin Fest, LLC*, 2021 WL 117036, at *12 (Del. Super. Jan. 13, 2021) (quoting *EZLinks Golf, LLC v. PCMS Datafit, Inc.*, 2017 WL 1312209, at *3 (Del. Super. Mar. 13, 2017)). *See also Stone & Paper Invests., LLC v. Blanch*, 2020 WL 3496694, at *8 (Del. Ch. June 29, 2020) (quoting *GreenStar IH Rep, LLC v. Tutor Perini Corp.*, 2017 WL 5035567, at *10 (Del. Ch. Oct. 31, 2017)) (articulating an identical standard under Court of Chancery Rule 9(b)).

[214] *Id.*

with Carter Farm for a decade.[215] Yet Carter Farm is alleged to have rejected every set of amendments NVR proposed.[216] Under these circumstances, any reasonably prudent person of ordinary intelligence would have viewed the RFP as a red flag and, even in the face of assurances,[217] would have undertaken additional investigation.

At a minimum, a reasonable, prudent person in NVR's shoes would have looked at sources of public records, where it would have seen (1) the recorded agricultural subdivision that eliminated three of the Original Parcels, (2) the recorded minor land development plan that created parcel 11-57.00-244 from one of the surviving Original Parcels, and (3) the deed conveying parcel 11-57.00-244 from Carter Farm to four other individuals. If NVR believed the LPAs had not expired, any one of the foregoing acts would have indicated that NVR had potential claims for breach of contract against Carter Farm. I recommend that the Court dismiss Count IV of the complaint as barred by the statute of limitations.

---

[215] *See, e.g.*, Compl. ¶ 24 ("Throughout the life of the project, *including in 2024*, the parties held numerous phone calls and in person meetings . . . ." (emphasis added)).

[216] *Id.* ¶¶ 24–32.

[217] "[T]he trusting plaintiff still must be *reasonably attentive* to [their] interests. . . . a plaintiff is on inquiry notice when the information underlying plaintiff's claim is readily available. . . . [The] [p]laintiffs were not entitled to sit idly by, blindly relying on [the] defendants' assurances . . . ." *In re Dean Witter*, 1998 WL 442456, at *8–9 (Del. Ch. July 17, 1998).

### 3.  Counts I, II, III and V are barred by laches.[218]

The remainder of NVR's claims are equitable in nature or request equitable relief, and I evaluate them under the doctrine of laches.[219] "'Laches is an affirmative defense that the plaintiff unreasonably delayed in bringing suit after learning of an infringement of his or her rights.' It consists of two elements: '(i) unreasonable delay in bringing a claim by a plaintiff with knowledge thereof, and (ii) resulting prejudice to the defendant.'"[220]

"A filing after the expiration of the analogous limitations period is presumptively an unreasonable delay for purposes of laches,"[221] and the analogous statute of limitations applies absent "unusual conditions or extraordinary circumstances."[222] "Laches is fundamentally concerned with the prevention of inequity in permitting a claim to be enforced."[223] Therefore, "[c]hange of position on the part of those affected by non-action, and the

---

[218] These counts seek to rescind the Choptank transfer (Count I) and the record plan filed in 2022 (Count II), specific performance of the LPAs (Count III) and damages against Choptank for tortious interference with the LPAs (Count V).

[219] *See* Donald J. Wolfe & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 2.03[b][i] (T. Brad Davey et al., eds. 2d ed. 2024) (listing equitable causes of actions).

[220] *West Palm Beach*, 310 A.3d at 993 (quoting *Levy v. Brownstone Asset Mgmt., L.P.*, 76 A.3d 764, 769 (Del. 2013)).

[221] *Levy*, 76 A.3d at 769.

[222] *IAC/InterActiveCorp v. O'Brien*, 26 A.3d 174, 178 (Del. 2011).

[223] *Ontario Provincial Council of Carpenters' Pension Tr. Fund v. Walton*, 294 A.3d 65, 98 (Del. Ch. 2023) (quotation omitted).

intervention of rights are factors of supreme importance."[224] "Inequity [(prejudice)] for this purpose arises where there occurs some change in the condition or relation of the parties or the property involved in the pending lawsuit."[225]

Laches is fact dependent; sometimes even a short delay can be unreasonable.[226] "The temporal aspect of the delay is less critical than the reasons for it."[227] Further, "[c]hange of position on the part of those affected by non-action, and the intervention of rights are factors of supreme importance."[228]

In this case, I conclude that NVR had actual notice of its claims from at least January of 2021, when it received a copy of Carter Farm's RFP.[229] In light of the lack of progress on the project and Carter Farm's rejection of NVR's proposed amendments in 2017, the RFP at least constituted a red flag

[224] *Hudak v. Procek*, 727 A.2d 841, 843 (Del. 1999) (quoting *Fed. United Corp. v. Havender*, 11 A.2d 331, 345 (Del. 1940)).

[225] *West Palm Beach*, 310 A.3d at 1000 (quoting Donald J. Wolfe & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 15.07[c][4] (T. Brad Davey et al., eds. 2d ed. 2024).

[226] *See id.* at 7–8 ("An unreasonable delay can range from as long as several years to as little as one month").

[227] *Id.* at 7.

[228] *Hudak v. Procek*, 727 A.2d 841, 843 (Del. 1999) (quoting *Fed. United Corp. v. Havender*, 11 A.2d 331, 345 (Del. 1940)).

[229] Compl. ¶ 25.

that required further inquiry by NVR.[230]  Even under the most charitable interpretation of the facts, NVR initiated this suit months after its claims expired under the analogous statute of limitations.

In that time, Defendants invested time and resources in creating new subdivision proposals and marketing these proposals to other developers.[231] The Property had been subdivided and conveyed to third parties.[232]  Carter Farm pursued County approval of alternative development plans.[233]  Carter Farm later conveyed the remainder of the Property to Choptank.[234]  I conclude that it would be inequitable to grant NVR any of the equitable relief it seeks given its extended delay.  I recommend Counts I, II, III and V be dismissed under the doctrine of laches.

---

[230] *Id.* ¶ 24.

[231] *Id.* ¶ 25; OB Ex. I (RFP addressed to a generic recipient and stating it is accepting multiple "proposals").

[232] OB Exs. E, G, H. This was recorded in 2019. *See* New Castle Cty. Recorder of Deeds, *Public Access, Search, Instrument Id 20151019 0053268*, https://newcastl e.dts-de.com/PaxWorld/views/search# (last visited Feb. 1, 2026).

[233] *See generally* OB Exs. I–L, N–P.

[234] This was recorded in 2022. *See* Parcel Records, *Deed History* at 20220308 0027184 (last visited Jan. 25, 2026).

## CONCLUSION

For the foregoing reasons, I recommend that Counts I, II, III and V be dismissed as barred by laches, and that Count IV be dismissed as barred by the statute of limitations.[235] Because I recommend that the complaint be dismissed, I also recommend that the Lis Pendens be terminated.

This is a Final Report under Court of Chancery Rule 144.[236] Exceptions may be taken pursuant to Rule 144(c)(2).[237]

---

[235] Having found that all of NVR's claims are untimely, I need not address Defendants' other arguments: that NVR's pleadings on Counts I and II (seeking equitable rescission of the Choptank transfer and the record plan filed in 2022, respectively) are defective, that NVR is not entitled to specific performance, and that NVR has not adequately pled a claim for tortious inference.

[236] *See* Ct. Ch. R. 144(b)(2).

[237] Ct. Ch. R. 144(c)(2).